IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| REECE R. STACK, | ) | CASE NO. 4:11CV3197 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| BEN STYSKAL, in his individual | ) | |
| capacity, and W.H. MULHOLLAND, in | ) | |
| his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 110.) For the reasons explained below, Defendants' motion will be granted.

## BACKGROUND

Plaintiff Reece Stack, a pro se litigant, filed a Second Amended Complaint against Saunders County Corrections, Advanced Healthcare, Saunders County Director Ben Styskal ("Styskal"), Saunders County Deputy Director W.H. Mulholland ("Mulholland"), Officer Gerrish, and Mallory Reeves on June 5, 2012. (Filing No. 41.) In this Second Amended Complaint, Plaintiff alleged that staff at the Saunders County Jail gave him medication prescribed to another inmate. (*Id*.) Plaintiff claimed that he informed officer "A. Mendoza" and the State Ombudsman's Office about the issue, but the medication was not "fix[ed]," and his mental health got "so bad" that he broke "apart the [j]ail and was sent to the hole." (*Id*.) Plaintiff also alleged that he sent "kites"[1] to Styskal and Mulholland informing them about the medication issue, but that "nothing was ever done." (*Id*.) Plaintiff asked the Court to declare Defendants'

---

[1] Inmate communication forms.

acts unconstitutional, award damages in the amount of $500,000, and order any additional relief that the court deems proper. (*Id*.)

On August 14, 2012, the court issued a Memorandum and Order in which the court, liberally construing Plaintiff's Second Amended Complaint, found that Plaintiff had sufficiently alleged an Eighth Amendment medical claim against Styskal and Mulholland in their individual capacities. (Filing No. 43.) The court further concluded that Plaintiff may have claims for violations of state law against Styskal and Mulholland, such as negligence. The court dismissed Plaintiff's claims against Saunders County Corrections, Advanced Healthcare, Officer Gerrish, and Mallory Reeves. (*Id*.) The Court also dismissed Plaintiff's claims against Styskal and Mulholland in their official capacities, but allowed Plaintiff's Eighth Amendment medical claims and state law claims against Styskal and Mulholland in their individual capacities to proceed. (*Id*.)

## UNDISPUTED MATERIAL FACTS

1. Plaintiff was transferred from the State of Nebraska Diagnostic and Evaluation Center ("D & E") to the Saunders County Jail on or about May 24, 2011. (Filing No. 111-8.)

2. When Plaintiff was transported from D & E to the Saunders County Jail, Sergeant Jon Lee ("Lee") handled Plaintiff's intake procedures. The transporting officer, who was not a Saunders County employee, provided Lee with a brown paper bag of medications with Plaintiff's name handwritten on the outside of the bag. The bag contained five prescription pill bottles. The medications contained in the bottles were Clonazepam, Clonazepam AMR/HCL, Cymbalta, Divalproex and Amitriptyline. (Filing No. 111-2.)

3.     The Saunders County Jail contracts with a company called Advanced Correctional HealthCare ("ACH") to provide and oversee all aspects of medical care for inmates housed in its facility. (Filing No. 111-8.)

4.     A nurse employed by ACH is generally present in the jail facility on Monday through Friday, from 8:00 a.m. to 4:30 p.m. Outside of these times, correctional staff have to contact ACH for assistance and follow ACH's written protocols when inmate medical issues arise. ACH also schedules its medical professionals to see inmates at the facility on a weekly basis. (*Id.*)

5.     Correctional staff perform basic tasks with regard to inmate medication, such as calling to verify medications during intake and passing out prescription medications in the housing units. (*Id.*)

6.     When medications are received with an inmate from another facility, the correctional officer performing intake records the medication types, amounts, and dosages on a medication verification form, then calls ACH to obtain orders regarding the administration of the medications. (Filing No. 111-2.)

7.     On May 24, 2011, Lee contacted ACH to obtain orders regarding Plaintiff's prescription medications. The ACH on-call physician approved the administration of the Clonazepam, but ordered that it be reduced to twice daily. The physician approved the administration of Cymbalta "as long as supplied," and approved the administration of Divalproex "as prescribed." The physician did not approve the remaining two medications. (*Id.*)

8. The medications approved by the ACH physician were administered to Plaintiff for his first three days at the Saunders County Jail. (*Id.*)

9. Inmates at the Saunders County Jail have three methods of making formal complaints to staff. They can complete Inmate Request Forms ("kites") for general matters, which are typically addressed by the individual to whom they are directed. They can also complete sick call requests, which are evaluated by the medical staff employed by ACH. Finally, inmates can complete grievance forms to advance certain types of complaints. (Filing No. 111-8.)

10. With respect to grievances, a certain procedure is required, whereby a step 1 grievance is submitted to the shift supervisor. If the issue is unresolved at step 1, a step 2 appeal form is submitted to the lieutenant on duty. If the issue is not resolved at step 2, a step 3 appeal form is submitted to Styskal, as director of the facility. (*Id.*)

11. Styskal is not involved in responding to kites (unless directed to him personally), sick call requests, or step 1 and 2 grievances. Styskal becomes involved in such matters only when assistance is requested by staff. (*Id.*)

12. Mulholland does not work directly on the floor with inmates, nor is he generally involved in medical complaints of inmates. Mulholland is involved with staff training, investigations, and completion of paperwork. (Filing No. 111-21.)

13. Between May 25, 2011, and May 26, 2011, Plaintiff completed a sick call request and a step 1 and step 2 grievance form, complaining that he was not getting the same medications he received at D & E. Plaintiff claimed he was having "racing thoughts" and trouble sleeping. Correctional staff members responded to each of his complaints by advising

him that changes in his medication were based on the orders of ACH, and that he would been seen by ACH medical staff when possible. (Filing No. 111-8.)

14. On May 27, 2011, Plaintiff refused his morning pass of Clonazepam. (*Id*.) That evening, a correctional officer, Alejandra Mendoza ("Mendoza"), was performing the second daily medication pass when she noticed that the pill bottle containing Cymbalta that was to be administered to Plaintiff had the name "James Vance" on the label. Upon noticing the name on the pill bottle, Mendoza did not administer the Cymbalta to Plaintiff and contacted Lee, her direct supervisor. (Filing No. 111-1.)

15. Lee immediately investigated the situation and determined that when he handled intake for Plaintiff three days earlier, he inadvertently failed to notice the name on the label of the Cymbalta pill bottle. Lee notified ACH medical staff of the situation. (Filing No. 111-8.)

16. Lee was subsequently issued a disciplinary notice for his inattention to detail with respect to the medication error, and the incident was documented and acknowledged by Lee's completion of a medication error form and incident report. (Filing No. 111-7.)

17. Styskal was not told about the medication error until days after it occurred, but once he learned of it, he verified that the necessary documents had been completed. Styskal was never informed that Plaintiff was suffering from any medical distress as a result of the medication error. (Filing No. 111-8.)

18. On the same day that the medication error was discovered, Plaintiff submitted a new step 1 grievance, complaining about the medication error. Lee responded to the form by explaining the reasons for his mistake. Plaintiff also submitted a kite to the lieutenant on

duty to complain about his medications. The lieutenant advised Plaintiff that his prescriptions had been changed due to the different medical protocols of the two facilities, and that Plaintiff would be seen by a nurse to discuss his situation. (*Id.*)

19. On May 28, 2011, Plaintiff submitted a step 3 grievance, complaining about the medication error. Styskal responded to the form by acknowledging the error and advising Plaintiff that appropriate action was being taken. That day, Plaintiff also completed a sick call request form, asking that he be given his medications from D & E and that he be seen by a nurse. He also complained that he had sleeplessness and "racing thoughts." (*Id.*)

20. On the evening of May 29, 2011, Plaintiff complained of chest pains. Correctional staff contacted a medical professional at ACH. Plaintiff reported that he did not know what caused the chest pains, and that he had experienced the same pain "a few days ago." ACH advised correctional staff to continue Plaintiff's medications as prescribed, observe him, and call back if symptoms worsened. (*Id.*)

21. Plaintiff submitted three kites between May 28 and May 29, 2011, seeking documentation regarding the medication error. Correctional staff responded to the kites by providing Plaintiff with the requested documents and advising Plaintiff to have his lawyer contact ACH. (*Id.*)

22. On May 30, 2011, Plaintiff submitted a step 3 grievance, again complaining about the medication error. Styskal responded to the grievance by advising Plaintiff that he needed to follow the three-step procedure in submitting grievances. (*Id.*)

23. On May 31, 2011, Plaintiff refused his morning dose of Clonazepam. (*Id.*)

24. On May 31, 2011, Plaintiff was examined by ACH medical staff. Plaintiff's medications were evaluated by ACH medical professionals and adjusted according to the exercise of their professional judgment. Specifically, Plaintiff's Clonazepam was increased to three times daily. (*Id.*)

25. Because Plaintiff was to be administered Clonazepam three times daily, staff had to conduct a special medication pass to Plaintiff at 2:00 p.m. each day, which is outside of the normal time for medication passes. (*Id.*)

26. On June 1, 2011, the day after Plaintiff had been seen by ACH medical staff and had his medication adjusted, Plaintiff submitted another grievance form and sick call request, again complaining about the medication error. He also complained that he was not receiving the same medications as he had at D & E and that he needed a prescription for Depakote filled. The grievance form was submitted as a step 3, and Styskal responded to the grievance by advising Plaintiff that he had not followed the proper procedure in submitting the grievance. (*Id.*)

27. On June 2, 2011, Plaintiff was seen and evaluated by a medical professional employed by ACH. Plaintiff's medications were adjusted by adding a prescription for Amitriptyline. (*Id.*)

28. Between June 3, 2011 and June 9, 2011, Plaintiff submitted several kites, sick call requests, and grievances. Among other things, Plaintiff asked that he be returned to D & E and that he receive mental health counseling and treatment for a suspected STD. One of these forms was a step 3 grievance submitted to Styskal, complaining that Lee had "lied" about the medication error. Styskal responded to the grievance by advising Plaintiff that he

had not followed the proper procedure in filing the grievance. However, Styskal reminded Plaintiff that Lee had never denied the circumstances of the medication error. Styskal also responded to numerous kites Plaintiff directed to him in this time period by acknowledging the medication error and advising Plaintiff regarding his other complaints about his medical needs. (*Id.*)

29. On June 4, 2011, correctional staff mistakenly missed passing Plaintiff's afternoon dose of Clonazepam. Correctional staff contacted ACH and received orders from the physician on how to administer the remaining doses of medication. The physician's instructions were followed by correctional staff. (*Id.*)

30. Styskal was made aware of an occasional problem with the staff passing Plaintiff's afternoon medication on time. Consequently, Styskal counseled staff on the importance of timely passing medications and instructed them to contact ACH if medical guidance was needed. (*Id.*)

31. On June 8, 2011, Plaintiff signed a form stating that he refused to be seen by a nurse at sick call. (*Id.*)

32. On June 10, 2011, Plaintiff was seen and evaluated by a medical professional employed by ACH. His prescription medications were not changed. At that time, Plaintiff reported to the medical professional that his medications were working well and that he did not want any changes. (*Id.*)

33. Plaintiff contacted the State Ombudsman's Office regarding various complaints he had with the Saunders County facility, including all of his complaints regarding his

prescription medications and mental health. On July 6, 2011, the Ombudsman's Office issued a letter to Plaintiff explaining that its investigation did not reveal any basis for his complaints and that no further action would be taken by the Office. (Filing No. 111-14.)

34. On July 12, 2011, Plaintiff, assisted by another inmate, tied several doors of the jail facility closed and proceeded to damage jail property. Plaintiff later directed a kite to Styskal stating that the only reason he had engaged in this behavior was because he was angry at Styskal for lying to the Ombudsman's Office. Plaintiff was later convicted of a criminal charge resulting from the July 12, 2011, incident. (Filing No. 111-8.)

35. On July 13, 2011, Plaintiff refused his morning pass of Clonazepam. The following day, Plaintiff threatened suicide and was placed on suicide watch. Plaintiff initially refused to see the nurse practitioner employed by ACH and demanded to see a mental health specialist. On July 22, 2011, Plaintiff allowed an ACH medical professional to examine him. At that time, Plaintiff made statements indicating that he had threatened suicide because he did not want to be separated from his cousin. Plaintiff also stated that his medications were working and he had no complaints. Plaintiff signed a form stating that he requested to be released from suicide precautions. (*Id.*)

36. In connection with this suit, an adult psychiatrist and psychopharmacologist employed by ACH, Dr. Montes de Oca, independently reviewed Plaintiff's medical file. Dr. Montes de Oca opined that Cymbalta usually takes two to three weeks before efficacy can be noticed, and that any rebound effect from discontinuation of Cymbalta is seen after taking it daily for several weeks. Dr. Montes de Oca opined that although Cymbalta was incorrectly given to Plaintiff for three days, the medication error would cause no harm. He stated that

9

frequent side effects of Cymbalta do not include chest pain. Dr. Montes de Oca further opined that Plaintiff's behavior on July 12, 2011, was not related to the medication error. (Filing No. 111-15.)

37.     Dr. Montes de Oca also stated that Clonazepam has a long half life and that it takes the body twenty to sixty hours to eliminate it. Dr. Montes de Oca stated that a dose of Clonazepam in a patient taking it three times a day is usually well tolerated and no significant withdrawal symptoms are observed. (*Id*.)

## ANALYSIS

### I. Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.*

Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II.     Defendants' Motion–Qualified Immunity

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id*.

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id*. "Courts may exercise their

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

Liberally construed, Plaintiff's Complaint alleges that Defendants violated Plaintiff's Eighth Amendment right to medical care by mistakenly giving him the medication of another individual, failing to timely pass his medication, and refusing to provide him the medication he received at D & E. Plaintiff claims that as a result of Defendants' failure to reasonably respond to Plaintiff's medical issues, his physical and mental health deteriorated.

To sustain a claim relating to medical care under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The plaintiff must allege and show that he suffered objectively serious medical needs, and that officials were actually aware of, but deliberately disregarded those needs. *Hartsfield v. Colburn*, 491 F.3d 394, 396-97 (8th Cir. 2007). "[S]ociety does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* (citing *Estelle*, 429 U.S. at 103-04).

Having reviewed all of the materials submitted, the court concludes that no reasonable fact-finder could determine that a constitutional violation occurred in this case. There has been no showing that any delays or mistakes with respect to medication actually caused an adverse effect on Plaintiff's health. To the contrary, the undisputed medical evidence shows that the complained-of medication error and slight delays in receiving medication did not

12

detrimentally affect Plaintiff. *See Docker v. Houston*, No. 8:04CV128, 2006 WL 373839, *4 (D. Neb. Feb. 16, 2006) ("A plaintiff who complains that delay(s) in medical treatment violated the Eighth Amendment must present medical evidence that such delay(s) actually caused an adverse effect on the plaintiff's condition").

Even assuming a serious medical need existed, there is no evidence that Defendants deliberately disregarded any such need. Defendants acknowledge that a medication error was made. However, upon realizing the mistake, jail staff promptly took corrective action. Defendants further acknowledge that Plaintiff's afternoon pass of Clonazepam was late on a couple of occasions. Again, however, corrective action was promptly taken. Plaintiff was examined by medical personnel on multiple dates while at Saunders County Jail, and there is no evidence that Plaintiff was ever denied medical care. In fact, on one occasion, Plaintiff refused to be seen by a nurse at sick call. Plaintiff's medication was adjusted several times upon being evaluated by medical professionals and, on June 10, 2011, following the medication error, Plaintiff reported to a ACH medical professional that his medications were working well and that he did not want any changes. Viewed most favorably to Plaintiff, the undisputed facts show that Defendants were not deliberately indifferent to Plaintiff's medical needs, serious or otherwise. Therefore, Defendants are entitled to qualified immunity and the federal claims against them are dismissed.

## III.  Defendants' Motion–State Law Claims

The Court's August 12, 2012, Memorandum and Order liberally construed Plaintiff's Second Amended Complaint as potentially encompassing state law claims, such as negligence. (Filing No. 43.) However, because the court has now dismissed Plaintiff's federal

claims, the Court declines to exercise supplemental jurisdiction over any remaining state law claims. See 28 U.S.C. § 1367(c)(3). The court will dismiss the state law claims without prejudice to reassertion in the proper forum. Accordingly,

IT IS ORDERED:

1. Defendants' Motion for Summary Judgment (filing no. 110) is granted. Plaintiff's federal law claims are dismissed with prejudice, and Plaintiff's state law claims are dismissed without prejudice to reassertion in the proper forum.

2. A separate judgment will be entered in accordance with this Memorandum and Order.

DATED this 4th day of August, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge